Good afternoon, your honors. I would like to reserve rebuttal of two minutes. Thank you. May it please the court. My name is Jeffrey Okun. I represent Petitioner Boubacar Darme. This case concerns the plight of a gay man from Senegal. In Senegal, being gay is a crime. After Petitioner's sexual orientation was exposed, he was physically assaulted by half-brothers in Senegal. His mother and four siblings demanded he leave the home. Their hostility was becoming palpable. He fled Senegal. Eventually, in the United States, he filed for political asylum. He did not win before the immigration judge. During the appeal, we filed a motion for remand. In that motion, we included a report from an expert on Senegal. That individual indicated that if Mr. Darme is deported, he'll be assaulted by family and the community with the help of the police. In order to avoid this danger, Mr. Darme had to stay with his husband in the United States as he is married here. He needs to overcome an adverse credibility finding and show this court that he did not have a full and fair hearing. The adverse credibility finding cannot survive this court's reasonable scrutiny. Per this court's decision, Shrestha v. Holder, this court needs to know and explore Mr. Darme's individual circumstances. Petitioner was pro se. He speaks Wolof only. He could read some Arabic from his prior training. In America, he learned English while sitting and waiting for his hearing while in detention. However, he was alone in America. His New York cousin refused to take most of his phone calls. In court, the immigration judge, the first judge, told them an attorney from a legal orientation program will fill out an asylum application for you. I have a question on that. Yes, Your Honor. There is really, first of all, it is somewhat disturbing to have these people who are trying to be helpful, you know, told that they have to do a lot more than they really have time or energy to do. But even that aside, there's nothing about the application that's an issue, is it? Is there? On the contrary, Your Honor. The application did not include a separate written statement in support of the claim. In some of the boxes on the forms, somebody in the jail helped to fill in the basic idea that he feared returning to Senegal as a gay man and as a Muslim. But it wasn't faulted for anything in the application, including that, right? I mean, often people write things in the application and then they're said to have contradicted themselves in the hearing. But that's not what happened here. It was true with regard to the credibility hearing, but not the application. However, because there was no statement, the judge had to clean the claim. The judge had to, on her own, try to determine what was going on. However, the judge was also laden with a translator who was not pulling his weight. The translator left a lot of statements as Mr. Drame had shared them, not completely translated. For example, there were a few examples where he had stated, who I fear back in Senegal is my family because my half brothers are many. All the translator said is my family with regard to a description of what's going to happen. So Mr. Drame at one point left the home and after an attack had been perpetrated against him, he went to his mother's home. That's where he was feeling unwelcome. He left to go get a painkiller. Wait a second, did he have another home? I thought he lived with his mother, no? He lived with his home, but then he, that was the question. The judge didn't determine what he meant when he said, I went to house. So what had happened was he went to a friend's house because the only actual home that he had was his mother's home. But he did have a friend who agreed to house him for the few weeks before he fled the country. But I thought he was staying with his That's the point. I'm sorry to talk over you. He didn't convey because the translator didn't help and the judge didn't ask necessary follow-up questions as she was trying to glean the testimony, which a statement would have helped obviate the need to do as hard as she might have been trying. The home that he went to, he only stayed for a few short hours after the incident. That's one of our... Can we go back to a question Judge Berzon had asked before, which was what is the Esperanza Immigrant Rights Project was the organization that was helping him with the application? What is your contention that that immigrants' rights group did wrong here that affected your client adversely? So in two regards, I would suggest that they had to prepare a separate written statement in full with regard to all issues that the asylum application asks for, such as did anything, did any harm ever happen to you? Judges want the blow by blow. They want the exact statement from beginning to end in immigration court proceedings. They want to know details. But was that what this group was supposed to do? I mean, it seems that this group was trying to do a good thing and to be helpful to your client, and now they're being faulted, including through a bar complaint, which is a serious allegation to bring against an attorney. I agree with you. Attorneys who... I filed a couple of those in my career. I do that with a heavy heart. I don't enjoy being a police officer for the legal system. But the attorney who backs that legal assistant, who the Immigration Appeals didn't acknowledge, was supervised by an attorney. However, the point is that the attorney knows the form says statement. And that attorney revealed to me, and I revealed to Mr. Drame, that he had been told by the judges that they want statements. So he knew that statements are necessary for these proceedings. The question is whether he committed to do it. It's a hard problem, actually. But let me go back to the thing about the house and so on. I don't really understand what you're saying. Did he... I thought that he, for the bulk of the time before he left Senegal, he was in his mother's house. No, just the first night. So we had submitted a supplemental statement. Where is that in the transcript? In the transcript, I don't have the from the pharmacy. There's a conversation that he went to house. In that conversation, the colloquy with the court, he also indicates that he, at one point, with regard to the brothers looking for him. At one point, he also says, I was not there. He also does say, I was thrown out. Not physically thrown out, but my mother demanded that I leave the home. All told, these statements indicate that the judge was not following up properly with Mr. Drame as to where he was going. Yes, he did stay for a few hours, but then when he went for the painkiller, he used that as his opportunity to leave the home for good. And although it's not clear, we attribute some of that fault to the judge for not following up. And her first question... So after you went and got medicine and went back home, what happened? Now, I'm reading from the transcript, not from your very nicely color annotated one, but from the one in the original. After that, I stayed home. I didn't go anywhere. Did he not say I stayed home? So he doesn't... So one of the issues is he doesn't state which home. And that's one of the... So you could argue, and perhaps give Mr. Drame the benefit of the doubt, that he didn't think through this carefully, how to answer this question. They were looking for me, but they would not come into our house because we were not living in the same house. They would not dare come into our house. And that's why he says this thing about, you were safe in your mother's home for the next month. I meant I was there, but I did not go out. Now, is that all not... Is there any reason to think that was not translated properly? There are other indications that the translator is erring throughout the process. Well, I know that, but this particular one... I always worry about the translations, especially when the credibility determinations get too finicky about the translations. Like he said, I'm calling, well, we don't know what he actually said, in terms of what call means, and whatever language was in Wolof. So, yes, I understand the problem, but it seemed pretty clear to me that he was at his mother's house all this time. When you go to the credible fear interview statement, it does also indicate that he went to a friend's home. So, in retrospect, Mr. Dramme might not have been thinking carefully. This might have been an example of time when his headache might have been coming up. He was tired during this court hearing. Did he ever actually say that he had a headache during that? There was a very good, interesting and useful testimony by the doctor. And you, by the way, have done an incredible job in this case, in terms of finding good information and so on. But still, I didn't think he said, ever said, did he ever say that I had a headache during the hearing? I believe you're right, Your Honor. I don't believe he did share that with the court. With regard to, I also think where I find fault with Her Honor, with the immigration judge, because she did not permit him an opportunity to narrate the whole claim. In a couple of instances, she suggested to him that he essentially narrate a portion, such as take me through the day, but she quickly stopped him because apparently his answer wasn't going in the direction she wanted. So she shut that narration down. There was another incident where she allowed for narration and she shut that down too. But at the end of testimony, she blamed him for it. She attributed the fault of not narrating to him when she was the one who stopped the narration. But she had never indicated from the very beginning that you can be your attorney and narrate your claim. She just, in the course of proceedings, gave him that opportunity without telling him that that's what it is. So, we'll go back to this point about he wasn't at his mother's house. Then he says, I was not safe at my mother's house because they just didn't have an alternative to go somewhere else. It just doesn't seem to be consistent with the whole story that he wasn't at his mother's house the whole time. I don't know if that makes a difference. Well, I see your point with regard to that confusion, but I would attribute that to his confusion because when he had the opportunity to sit with a lawyer and think through his claim, he shared, because this was only the second time in his life that he essentially shared his story. Once was at credible fear and once was in front of the immigration judge. And additionally, with regard to the judge and the government attorney and the credible fear statement, there was no provision of this statement, which resulted in four discrepancies, to be put in front of him with a translation. And that's why we argued that the lawyer should have also done a Freedom of Information Act request for him. However... The problem is that there's no... I mean, the BIA did assume that he thought this woman who filled out the form was a lawyer. They assumed that much. So, I guess the fact that she wasn't a lawyer at this juncture doesn't actually matter. But, on the other hand, they certainly did have committed to only a limited undertaking, right? Correct. They also understood that she was under the attorney's supervision, but because of the adverse credibility finding, they refused to do anything about an effective assistance of counsel. But that allowed to continue. Even if the legal orientation program didn't have to do a Freedom of Information Act request for him, they should have said, we know that the government attorneys want to cross-examine you with anything they can find. There's something called a credible fear witness summary, not even statement. I sometimes incorrectly refer to that as a statement. It's a summary of his testimony. They should have allowed him, told him, you can get this. Is that the... Yes, Your Honor. Is the credible fear statement the thing that's headed statement of RoboCard robbing? Is that the statement? It should indicate, it should refer to credible fear at the top of it. The one that I have doesn't do that. So that's what I'm trying to find out. It should even be listing Q&A. It's an early document in the record of proceeding because it happened very early in the proceedings before I threw like a 500 page motion into the record. So I see my time is up. Good afternoon, Your Honor. May it please the court. My name is Alana. I just want to make sure the courtroom clock has not yet started. There we go. Good afternoon, Your Honor. May it please the court. My name is Alana J. Snyder and I'm here today on behalf of the United States Attorney General. We respectfully request that the court deny these petitions for review for three reasons. First, substantial evidence supports the agency's adverse credibility determination. Second, petitioner was provided a full and fair hearing in this case and cannot show prejudice. And third, the board did not abuse its discretion in determining that Mr. Darmay did not establish ineffective assistance of counsel. So turning to our first argument regarding substantial evidence supporting the agency's adverse credibility determination. Here, the agency referred to here on the four inconsistencies, external inconsistencies here between the credible fear interview and to Judge Berzon's earlier question. You can find that at administrative record page 961 to pages 973. And these are external inconsistencies between the credible fear interview and then between petitioner's testimony. The four are the length of the alleged beating that petitioner suffered. Second, the name of petitioner's alleged partner in Senegal. Third, where petitioner resided after the beating, which is something Judge Berzon mentioned before. And fourth, whether petitioner received medical treatment after the beating and what kind of medical treatment he received. And it's the government's contention in this case that all of these inconsistencies I just mentioned relate to the claim that petitioner was harmed because he's gay. And these events are central to his version of why he was persecuted or what led to his departure, which of course we know under Zavanaugh versus Holder can constitute material inconsistencies, which are doubtless a great weight. So I'll just back up and flesh out each one of these for the court. First, regarding the length of the beating and the credible fear interview. And you can find this at page 970 of the administrative record. Petitioner stated under oath to the asylum officer that he was beat for 20 minutes. In testimony, he then inflated essentially the time or the length of the beating and said that he was beat for one hour. When asked to explain this, I'm sorry, what was that? The whole incident took an hour. I was beaten for 20 minutes and then I was running away. Right. And that's what I was getting at. That essentially he provided an explanation just like your honor said. And the reason why it was reasonable for the immigration judge to reject that explanation is because it materially conflicted with something else that the which was that nobody intervened during the beating. So the immigration judge in rejecting that contention essentially saw that that did not square with something petitioner had said. Petitioner had said in his credible fear interview that nobody intervened in the beating and then said, I'm sorry, what was that? He didn't say anybody intervened. He said he ran away. No, in testimony, he had said that he ran away. He was able to. I don't understand. He said it took an hour. And then in the session when he said it was he was beaten for 20 minutes, his testimony said it was an hour. And then he explained it and included the time he was running away. Who was intervening? There was nobody intervening in either story. During the testimony, petitioner stated that he was able to run away because individuals intervened in the beating. I'm sorry if they didn't make that clear, which materially conflicted with what he said in the credible fear interview that nobody had intervened. So, again, it was a reasonable rejection of that explanation. And again, to the to the second basis of the second external inconsistency, as I like to call them, the name of petitioner's alleged partner in Senegal. He stated in a credible fear interview that his alleged partner's name was only Julie Day. And then in testimony stated that his name was Matar Daya. And when asked to explain, this is at page 842 of the administrative record. The petitioner essentially stated, I don't have any explanation. I didn't say that to the credible fear interviewer. And this case and this sort of highlights some of the other explanations that petitioner has provided and stated that I didn't say that to the credible fear interview. But here we have a credible fear interview. That is, there's no indicia in this credible fear interview that the court should not rely or there was some there was some problem with the credible fear interview. Petitioner was sworn under oath, much like in the case of Lye versus Ashcroft. There was a contemporary contemporaneous question and answer. Sorry, this is at page 961 to 973 of the administrative record. It's labeled credible fear worksheet, record of determination, credible fear worksheet. And then if you skip ahead to page 966, you can see the oath that's administered to the interpreter. Of course, the interpreter is then given a chance to converse with Mr. Darmay. There then it's established that the two of them can connect with one another in their language. And then at page 973, and I think this is crucial to the government's point here, at the conclusion of the credible fear interview, the asylum officer said, did you understand everything the interpreter said? You know, I just want to make sure that everything was understood here. And petitioner confirms not only once, but twice, that he understood everything. And that and so so to the petitioner's explanation that he, you know, the court shouldn't rely on the credible fear interview, or there's something calling that into question. The government's contention here is there's absolutely nothing calling the credible interview into question. And then regarding where petitioner resided after the beating, just to sort of clarify the issue there, in the credible fear interview, petitioner testified that he resided with friends after the beating. In testimony, repeatedly, multiple times, and I can point out the places, pages 817 to 818 in the record, 822 to 823 in the administrative record, petitioner stated he lived with his mother, which of course Judge Berzon was getting at earlier. And again, his explanation was with regard to the credible fear interview, not being reliable. But under this court's precedent of Lye versus Ashcroft, we implore the court to rely on the inconsistencies between the credible fear interview and petitioner's testimony here. And then finally, whether petitioner received medical treatment after the beating. In the credible fear interview, petitioner stated that he received treatment at a hospital for two days. And then in testimony, he stated, no, actually, I went to a pharmacy and only got over-the-counter treatment. And while this may not seem like a material inconsistency, because it's not an inflation of the harm, right, he was saying first that he went to a hospital, and then that he went to a pharmacy. So that seems to be some sort of, if you will, deflate, I'm not exactly sure how to say that, deflation or lowering of the harm. Here, the question of whether or not petitioner went to the pharmacy is material to the claim of why he left Senegal. Because petitioner alleges that when he was in that pharmacy, he allegedly saw one of his brothers who came over and made a threat to him, and that prompted him to leave Senegal. So here we have four very strong inconsistencies that are relating to the claim that petitioner was harmed because he was gay. And so we submit to your honors that the agency's adverse credibility determination is supported by substantial evidence. I'm sorry, did you have a question, your honor? Sorry, I'm sorry. And then just turning to our, just to address the court's concerns about the ineffective assistance of counsel claim, and to some of the points made earlier about ineffective assistance of counsel, it's the government's contention here that there was no ineffective assistance of counsel for three reasons. First and foremost, the petitioner has not established that Esperanza undertook any of the tasks that petitioner has alleged that Esperanza failed to discharge. So here, petitioner is alleging that Esperanza failed to file the FOIA as was discussed previously. Again, these individuals are legal orientation program providers provided through contract by the Executive Office for Immigration Review. They are, by their own statement on their website, objective information providers. Their point is to provide detained immigrants... Well, but the, but the, but the, but the, the LJ did tell him, I mean, IJ did tell him that they were going to help him fill out his application. Did tell him that. Yes, but the immigration judge did not assure, contrary to petitioner's contentions, the immigration judge did not assure the petitioner that an, you know, an attorney was going to represent him or to come to court. In fact... But there is a difference between providing information and helping you individually fill out an application. And there is, and if they're going to help you fill out the application, they would do it properly. And it is true that in every, just about every application I've seen, there is a declaration or an affidavit attached to it. Yes. And to underscore your Honor's point, actually, the application was signed by the LLP provider. Ms. Dominguez signed it on page 100 and 1016 of the administrative record. Who's responsible for the fact that they did not put a narrative into the application? To this point, we would respectfully turn to the argument that even assuming that they were, which it's the government's contention that they're not, because this does not fall within their express duties and this is not, they're only limited and narrow in scope duties, which contain four different things. And none of these have... Yeah, according to whom? That's what I'm understanding. Because that's what their contract is with the government? That's correct. And in fact, the legal orientation program is organized under the Office of Legal Assistance Programs of the Executive Office for Immigration Review. And again, they have a strict contract under which they only provide four duties, which is a group orientation, an individual orientation, a self-help workshop, which is I assume this happened. And then I don't know, but this is just for the assumption purposes here. And then finally, a possible referral to a pro bono attorney. The board didn't rely on any of that, right? That seems like it would have maybe been a good basis for rejecting an ineffective assistance claim. But the only rationale that I see articulated in the board's decision is that there was no prejudice. So maybe, can you address that point? Sure, absolutely. And that was sort of where I was... That's a good springboard into the remainder of my response to Judge Prezant's question as well, that in any event, the agency didn't rely on any of the inconsistencies that were between the asylum application and petitioner's testimony and the adverse credibility determination. In fact, the immigration judge at the beginning of her proceedings, recognizing that the petitioner spent the first 20 pages of the transcript going through the application sort of line by line, question by question, and then at a certain point in the record, went off of the record, this is an administrative record, page 799, and says, okay, now I'm looking at the application and I'm going to go off the record, take a little break, and then we're going to come back and I'm going to flesh out the rest of this application with you. So to that point, of course, with in this case. And then to the argument that petitioner was not provided with a full and fair hearing, and to that end, with regards to the interpretation argument, we would respectfully assert, Your Honors, that there is also no prejudice in this case, which, of course, the petitioner must show that a better interpretation would have made a difference in the outcome of the hearing, which we cannot show here. Petitioner points to five different instances in the record, none of which did the agency rely upon in reaching its adverse credibility. Assuming that the person who did the second translation, that the original translation was truncated and not very accurate in general. I mean, in other words, it was just a whole lot of things were said a lot and they translated a little, or it was just inexact. It wasn't so much flat wrong as just inexact and confusing. I mean, to that point, Your Honor, I would respond that in Sion v. Holder, or Sion v. Holder, excuse me, and in the case of Sion v. INS, this court, you know, this court has determined that essentially an alien must show that a better interpretation would have made, likely would have... For example, this thing about the phone call. It wasn't one of the examples he used. But he said, I called, but it was an example that was relied upon. Yes. He said, I called this person and he said, I thought your mother took the phone away. And he said, oh, well, what I mean was I went there and I called for him and called him back. Now, we have no clue what, you know, how that works in Wallop in terms of whether the words call are the same words. And we have some reason to doubt the exactness of the translation to the degree that call, you can focus on the word call and think that was a contradiction. I mean, to that point, I can sort of speak to that the immigration judge's rejection of that was reasonable, given that the petitioner essentially was asking the immigration judge to accept the proposition that Mr. Darnay, without having previously called an individual over the phone while he was in fear for his life and in flight, grabbed all of his belongings conspicuously. My apologies. I see that I'm running over time. May I continue to answer the question? I didn't think he was taking all his belongings. I think he went over there to tell this guy that he wanted to bring not his belongings, but things he was selling back and have him give him the money for it. Right. And petitioner's testimony is pretty clear that basically what he did was, at least initially, his testimony was he called the merchant to sell his goods. And by his interpretation, he called out to him with the goods in hand, exchanged the goods and then required the petitioner to be in the streets of Senegal while he is afraid for his life, allegedly, very conspicuously, with all of these things on a lark that the merchant would have accepted his goods in return and exchanged the money for them. So the immigration judge's rejection of that explanation was reasonable. With that, your honors, I can see here that my time is more than coming to a close. And so we respectfully, if there are no further questions. Thank you very much. Thank you. Respectfully request that the court deny these petitions for review. Is this my opportunity for rebuttal, your honor? Thank you. I just wanted to indicate with regard to these, um, these external inconsistencies as honest attorney discusses, um, you have Mr. Jami's, um, um, interpreter explaining. There is no such word as only Billie G and well, if somehow that got into the record, it's unclear how, um, in terms of the medical treatment he added in his statement to the board, which could have considered any discussion with regard to any prior adverse credibility as one last attempt to try to explain any errors. He indicated that there was a clinic attached to that pharmacy and that could account for why there's some overlap between not necessarily pharmacy, but clinic and hospital. And additionally, with regard to the, yes, your honor. Well, the problem is trying to read the incredible fear interview, which is not a day, right? It's a summer. So he says, did you have to go to a hospital? Yes. I was there for two days, got treatment. Now that was literally what he said. You think, well, he was in the hospital. I understand that there's been clinic in the hospital. That seems fine. I mean, that's the written, especially as translate, but as written, and he says, I was there for two days. Now what I have said, I went there two times and we don't really know what he said is the problem. If you take, if you believe what it is, well, then he was there for two days and that's different from, he was at the hospital for two days. And that's different from going twice. That's a very choppy summary though. However, if he was given the opportunity to look at this credible fear summary before testimony began, as the first judge had promised him, these four discrepancies might never become discrepancies. And that's one of the reasons why he was prejudiced in this matter. Well, that's one way to look at it. Another way to look at it is that they didn't, that he would have conformed his testimony to the, um, incredible fear interview, but that didn't make it right. I mean, he's a man of truth. Same thing. I'm sorry, your Honor. Same thing seems totally bizarre. I noticed that that same name was written completely differently somewhere in the record. And the name of the boyfriend is pronounced Matar Jop. Still, it doesn't sound anything like Olibiliji. So, and there's just no accounting for how such a word would have gotten in there. And if he wanted to, um, come up with a name, a Senegal name, it would have been something more along the lines of Matar Jop than something that doesn't exist in Wallachia. Um, all right. Thank you. Thank you, your Honor. Thank you, your Honors. Thank both of you for your useful arguments. Um, in the case of Dorma, Dorma or Droma versus Bar, maybe I want to go to Fisher versus Stachyton.
judges: Berzon, Miller, Bress